**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| THE MARYLAND ECONOMIC DEVELOPMENT CORPORATION d/b/a HYATT REGENCY CHESAPEAKE BAY GOLF RESORT, SPA AND MARINA, <br><br> Plaintiff, <br><br> v. <br><br> BLUE LEAF HOSPITALITY, INC., <br><br> Defendant, | Case No: |

**COMPLAINT**

Plaintiff the Maryland Economic Development Corporation d/b/a Hyatt Regency Chesapeake Bay, by and through its undersigned counsel, alleges as follows:

*THE PARTIES*

1. The Maryland Economic Development Corporation ("Owner") is a body politic and corporate and a public instrumentality of the State of Maryland, and the Owner of the Hyatt Regency Chesapeake Bay Golf Resort, Spa, and Marina, located in Cambridge, Maryland. MEDCO's principal place of business is in Maryland.

2. Defendant Blue Leaf Hospitality, Inc. ("Blue Leaf") is a Florida corporation with its principal place of business in Miami, Florida.

*JURISDICTION AND VENUE*

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is proper pursuant to 29 U.S.C. § 1391(b)(1).

## *FACTUAL BACKGROUND*

5. MEDCO was created to encourage commerce, retain and attract business and promote economic development in Maryland. MEDCO owns and, with Hyatt and others, developed the project commonly known as the Hyatt Regency Chesapeake Bay Golf Resort, Spa, and Marina, a Four Diamond destination located on the shores of the Chesapeake Bay (the "Resort").

6. In November 2016, Owner announced a $7 million renovation to the Resort to begin in the spring of 2017 (the "Project"). The Project included all-new renovated guestrooms including all-new furnishings and furniture in the rooms and bathrooms, and upgrades to all double room full-size beds to more spacious and comfortable queen-size beds. The Project was designed to incorporate the Resort's original nautical architectural elements, including colors and textures reflective of the surrounding environment that would ensure a relaxed guest experience.

7. Blue Leaf was charged with producing and delivering first-class furniture, furnishings, and other goods (the "Casegoods") for the Project.

## *BLUE LEAF'S MODEL ROOM AND NON-CONFORMING PRODUCTS*

8. In June 2016, Owner's interior design studio prepared shop drawings for two model rooms at the resort. The model rooms were to be used as the basis for selecting the ultimate supplier of the Casegoods.

9. Blue Leaf supplied the Casegoods for one of the two model rooms and represented that the Casegoods it supplied conformed to the specifications set forth in the designer's shop drawings.

10. Owner reasonably relied on Blue Leaf's representation that its Casegoods for the model room conformed to the designer's specifications when Owner reviewed Blue Leaf's goods and ultimately selected Blue Leaf to supply the Casegoods for the entire Project.

11. But Blue Leaf failed to supply Casegoods for the model room that conformed to the designer's specifications. For example, around November 11, 2016, Owner noticed that the stone in the model room was starting to stain. The specifications for the stone on the Project required (i) a white quartz that was a cedar stone quartz or equal, and (ii) that the stone contain 93% actual quartz or be treated with a penetrating stone sealer to minimize staining. Had Blue Leaf's stone conformed to these specifications, the model room unit would not have shown stains within the first two months of normal use.

12. Although Blue Leaf was notified of the staining of its quartz on November 11, 2016, Blue Leaf did not respond to the issue until December 5, 2017, and did not provide a proposal for a replacement stone product until December 14, 2016, more than a month after the issue was raised. Owner's designer approved the replacement stone product that same day, but Blue Leaf's failure to initially deliver a conforming product for the Project, and its failure to respond to and rectify the issue in a timely manner, caused a substantial delay to the Project.

### SHOP DRAWINGS AND THE SCHEDULE

*13.* Following Owner's selection of Blue Leaf to supply the Casegoods for the resort, Blue Leaf submitted shop drawings for the various Casegood items.

14. Blue Leaf knew that the Project required Blue Leaf to carefully coordinate and deliver the Casegoods in a timely manner but Blue Leaf was slow to deliver its shop drawings and to provide estimates for production and supply of the Casegoods.

15. Blue Leaf began submitting shop drawings to the interior designer before the Parties entered into the Contract, but took nearly two months to submit final drawings for approval.

16. Owner's designer for the Project responded to each of Blue Leaf's drawings within 5 business days. For example, Blue Leaf submitted the drawings for GC-204CC and GC-204-OP1 on December 6, 2016 and the interior designer approved the drawings on the same day, drawings submitted on October 25, 2016 were approved on November 1, 2016, and drawings submitted on November 17, 2016 were approved on November 22, 2016.

*17.* Blue Leaf did not submit its final bar drawing (GC-205) until December 17, 2016. The interior designer approved that drawing on December 19, 2016.

18. Blue Leaf's delays in submitting suitable shop drawings for the Casegoods caused significant delays to the Project schedule.

19. On or about November 3, 2016, Owner's project manager notified Blue Leaf of the full Project schedule, indicating that the Casegoods were to be delivered "by floor" and that the product for the 6th floor of the resort was needed "by the first week of February. 5th floor right behind it." A true and correct copy of the November 3, 2016 correspondence is attached as Exhibit 1.

20. Accordingly, Blue Leaf was aware – before it agreed to the Contract – of the full Project schedule and the need to deliver all of the Casegoods for each floor of the resort on a floor by floor basis so that construction could proceed efficiently and effectively.

### THE CONTRACT

21. On or about October 28, 2016, Blue Leaf submitted its initial Quote #BLHQ2630 to Owner's purchasing agent for the provision and production of multiple pieces of furniture for the Project.

22. On or about November 2, 2016, Owner's purchasing agent submitted Purchase Order Number RPM-161-70 to Blue Leaf. The Purchase Order stated that it was a "PLACE HOLDER TO MATCH QUOTE BLHQ2630" and included a "Need By Date" of January 20, 2017. Purchase Order #RPM-161-70 included certain "Vendor Requirements" and Owner's terms and conditions for the purchase. The original Purchase Order was issued so that Blue Leaf could invoice for the deposit it needed to procure certain materials for the Casegoods. A true and correct copy of Purchase Order Number RPM-161-70 is attached as Exhibit 2.

23. Two days later, on or around November 4, 2016, Blue Leaf submitted its revised Quote #BLHQ2630-01 to Owner's purchasing agent for $2,027,774.00. The quote stated that it was "FOB: Factory – Vietnam" and that the lead time was "12 to 14 weeks after approvals/COM." A true and correct copy of Blue Leaf's revised Quote is attached as Exhibit 3.

24. In response to Blue Leaf's revised Quote #BLHQ2630-01, Owner submitted Purchase Order #RPM-161-71 which stated that it was based on Quote #BLHQ2630-01 (as amended, the "Contract"). The Contract revised the "Need By Date" from that set forth in the original Purchase Order to "01-FEB-2017" and included the same "Vendor Requirements" and terms and conditions that were included with the original Purchase Order. A true and correct copy of the Contract is attached as Exhibit 4.

25. According to its terms, the Contract would be "formed by the Vendor's acceptance of this Contract, which constitutes the entire agreement among the Vendor, Customer

and Agent." The Contract further indicates that acceptance of the offer to enter into contract would be accomplished by Blue Leaf completing and returning an acknowledgment and that "[a]ny shipment made by Vendor shall be deemed an acceptance of the terms and conditions of the Contract, *notwithstanding any different, conflicting or additional terms or conditions contained in any quotation, acceptance, confirming memorandum, order acknowledgment, invoice or other document of the Vendor*." (Emphasis added.)

26. Blue Leaf accepted and acknowledged the Contract on or about November 9, 2016, in a document entitled "Acknowledgment" that referenced the Purchase Order #RPM-161-71. The total price for all of the goods is listed as $1,931,044.65 with the following "Terms: 50% Deposit, Bal TBD." A true and correct copy of Blue Leaf's Acknowledgment is attached as Exhibit 5.

27. On or about November 9, 2016, Blue Leaf submitted a "Proforma Invoice" for the Casegoods. The total listed on the Proforma Invoice for the Casegoods is $1,931,044.65. The Proforma Invoice includes terms and conditions that conflict with the terms and conditions set forth in the Purchase Order #RPM-161-71 but (a) those terms and conditions attempted to materially alter the Contract, (b) they were expressly rejected in the Purchase Order #RPM-161-71 which stated that acceptance was limited to the terms of the offer and any conflicting terms in any of Blue Leaf's subsequent documents were expressly rejected and objected to, and (c) Blue Leaf did not notify Owner that its acknowledgment was conditioned upon Owner's acceptance of the terms set forth in Blue Leaf's invoice. A true and correct copy of the November 9, 2016 invoice is attached as Exhibit 6.

28. On or about November 18, 2016, Owner revised the Contract in RPM-161-71 CO1. The "Need By Date" was still identified as February 1, 2017. The revised Contract stated

that "All Terms and Conditions of Original Purchase Order remain in effect unless specifically changed herein." A true and correct copy of Purchase Order Number RPM-161-71 CO1 is attached as Exhibit 7.

29. Blue Leaf did not object in writing or otherwise to any of the terms and conditions contained in RPM-161-71 CO1.

30. On or about November 28, 2016, Owner revised the Contract in RPM-161-71 CO2. The "Need By Date" was still identified as February 1, 2017. The revised Contract stated that "All Terms and Conditions of Original Purchase Order remain in effect unless specifically changed herein." A true and correct copy of Purchase Order Number RPM-161-71 CO2 is attached as Exhibit 8.

31. Blue Leaf did not object in writing or otherwise to any of the terms and conditions contained in RPM-161-71 CO2.

### *KEY TERMS OF THE CONTRACT*

32. The Contract identifies the items that Owner purchased from Blue Leaf including, but not limited to: dressers and consoles, desks, hospitality units, charging units, lighting, beds and headboards, nightstands, dining tables, and coffee tables (the "Casegoods" or "Subject Property" when described in the Contract).

33. In Paragraph 13 of the Contract, Blue Leaf "guarantee[d], warrant[ed] and represent[ed] that the Subject Property shall be new, shall conform to the description of same herein, shall be of merchantable quality, fit for the particular purposes and uses of the [Owner], and shall be free from defects, including (without limitation) those resulting from faulty workmanship and defective materials." The Contract continues that the "warranties contained

herein and any implied by law shall survive any acceptance, final inspection, and payment by the [Owner] and shall run in favor of the [Owner], its successors and assigns."

34. Under "Vendor Requirements," Blue Leaf agreed that to the extent it objected to the Vendor Requirements or the terms and conditions set forth in the Contract, it would expressly reject those Vendor Requirements or the terms and conditions it its acknowledgment:

> This order must be acknowledged by executing and returning a signed copy within fourteen (14) days of receipt. Definite shipping date must be stated with acknowledgments. It is understood that if vendor does not return a signed acknowledgment copy within fourteen (14) days of receipt of this order Vendor has accepted all terms and conditions as set forth in this Purchase Order.

35. Blue Leaf's acknowledgment did not include any objections, comments, revisions or any other changes to the Vendor Requirements or the terms and conditions set forth in the Contract.

36. In Paragraph 5 of the Contract, Blue Leaf agreed that "[i]n addition to any and all of [Owner's] and Agent's other rights provided herein or by operation of law, [Owner] and Agent shall have the right, but not the obligation, to replace Subject Property not complying with this Contract by buying from other suppliers, and in the event [Owner] or Agent exercise such right, Vendor shall reimburse [Owner] and Agent for all costs so incurred, including, but not limited to, costs incurred by [Owner] or Agent to obtain such replacement Subject Property whether by payment of a premium or by acceptance of less favorable terms than those governing this Contract."

37. Pursuant to Paragraph 21 of the Contract, the Parties agreed that Maryland law and venue would apply to any dispute among the parties: "All rights of the parties under the

Contract [would] be determined in accordance with the prevailing law of the state in which the Subject Property is delivered. . . ."

38.     In the event that Owner sues Blue Leaf to enforce the terms of the Contract, Blue Leaf agreed to "pay all costs and expenses, including all attorneys' fees and court costs, incurred by [Owner] and Agent in enforcing the terms and conditions of the Contract."

### BLUE LEAF FAILED TO PROVIDE QUALITY PRODUCTS THAT CONFORMED TO THE SPECIFICATIONS AND WERE FIT FOR THE INTENDED PURPOSE

39.     Blue Leaf represents itself to consumers as a producer of "superior casegoods, indoor and outdoor seating, upholstery, tables, and banquettes for the hospitality and commercial industries." Blue Leaf further markets itself as "founded on more than two decades of industry experience" and claims to offer "the highest level of quality and craftsmanship."

40.     According to Blue Leaf's website, Blue Leaf's "custom product solutions exceed expectations on functionality, design, durability, and customer service."

41.     Blue Leaf knew that the quality of craftsmanship of the Casegoods was critical to the success of the Project. Yet on multiple occasions, Blue Leaf failed to provide goods that met the specified design criteria.

42.     Owner provided early and repeated notice to Blue Leaf of variations in the finish and quality of the supplied goods versus the approved goods from the model room and/or the specifications. Yet with few exceptions, Blue Leaf refused to rectify the issues and refused to perform the necessary warranty work and/or replacement.

43.     A prime example of Blue Leaf's failure in this regard is the swift and escalating degradation of the hospitality units that Blue Leaf supplied to the Project. Blue Leaf had a duty under the Contract to design and manufacture a product that was suitable for use in a hospitality

application. It was Blue Leaf's responsibility to provide a unit that could withstand normal hospitality use. There is nothing unique about the way that the Resort guests use the hospitality units and no circumstances that differ from what Blue Leaf could and should have expected.

44. In particular, Blue Leaf knew that the hotel would be placing refrigerators in the hospitality units and was responsible for making a product that worked in an environment that it knew would contain moisture and resort guests using the unit for beverages. But the materials used to manufacture the units are proving insufficient for the hospitality application. The veneer is falling off and discolored in many places. There are cracks in the material and gaps where no gaps should exist. Many of the hospitality units have additional defects such as discoloration, fractures in the material, significant expansion of portions of the material, and delamination. Only after these defects surfaced at the resort did it become clear that Blue Leaf had used MDF for the units which is neither hospitality grade nor is it standard in the industry for hospitality applications.

45. In addition, Blue Leaf was notified early of differing finishes on the console units that are visible to the naked eye. In many rooms the finish on the console units is both partially shiny and partially matte but not only in places of high traffic where such deviations might be the anticipated result of use. For the consoles, the depth and degree of variation is far beyond that which should be experienced if the Casegoods actually conformed to the drawings and specifications for the Project.

46. In addition, Owner operates multiple Chesapeake suites for guests that want a true luxury experience. In many instances, these suites are rented out for conference guests and meetings. But the tables that Blue Leaf supplied for the Chesapeake suites are failing. The tabletops are cracking and the paint or finish on the tabletops is peeling. The result is a room that

does not look renovated. Owner has lost revenue and taken financial penalties due to the conditions of those tables.

47. On April 18, 2017, Owner notified Blue Leaf of significant finish variations between the approved Casegoods in the model rooms and the Casegoods supplied by Blue Leaf. This notice was provided before all of the Casegoods had been delivered. Owner provided additional notice to Blue Leaf of subsequent issues as they arose with the hospitality units showing damage, lighting/LED issues with headboards and bed platforms, and additional punchlist items. A true and correct copy of the April 18, 2017 correspondence is attached as Exhibit 9.

48. While Blue Leaf responded to a limited number of the punchlist items, Blue Leaf asserted that the items were related to maintenance or care issues and refused to provide warranty repair or replacement as agreed in the Contract.

### *BLUE LEAF FAILED TO DELIVER THE CASEGOODS IN A TIMELY MANNER AND AS AGREED IN THE CONTRACT*

49. Blue Leaf agreed in Paragraph 2 of the Contract that "Time is of the essence in the Vendor's performance of the Contract," and in Paragraph 7, that it "agrees to deliver and/or install as specified by Customer or Agent, the Subject Property on or before the delivery date set forth in the Contract, unless Agent or Customer designates a date for delivery and/or installation by Vendor later than that provided for in the Contract."

50. The Contract specified a "Need By Date" for the Casegoods of February 1, 2017.

51. Blue Leaf was aware at the time that it acknowledged the Contract of the need for deliveries to begin during the first week of February, so that construction and the Project could

proceed efficiently and be completed before the resort's busy season during the spring and summer months.

52. Other than the products supplied for the model room, Blue Leaf did not supply any Casegoods to the resort by February 1, 2017. Instead, Blue Leaf delivered every single item after the contractual deadline and after the dates Blue Leaf itself promised to meet in email correspondence.

53. For example, on November 29, 2016, Michelle Merkin from Hyatt emailed Ana Maria Jimenez of Blue Leaf requesting that "if anything is holding up production" that Blue Leaf push design forward. She also asked "[w]hen will I start getting updates on ship dates and what items will be ready for shipping?" (Emphasis added.) Ms. Jimenez responded that day that she was requesting "completion dates and shipping schedules" but did not provide shipping updates.

54. Ms. Jiminez did not respond until December 5, 2016, after Ms. Merkin again emailed asking for an update on the shipping. Only then, more than a month after initially receiving notice of the schedule and agreeing to a contractual "NEED-BY DATE" of February 1, 2017, did Ms. Jimenez respond. First, she set a date certain of January 20th for the first shipment. Second, she confirmed that Blue Leaf would be shipping complete floors, as the parties had agreed. Her email states: "We will be able to provide first two floors to ship by January 20th before TET holiday." (Emphasis added.) Blue Leaf did not, however, ship all of the casegoods for the first two floors on January 20, 2017, as promised.

55. Not only did Blue Leaf fail to meet the promised shipping and delivery dates, Blue Leaf failed to provide timely notification of its delivery delays. It was not until January 2017, two weeks before Blue Leaf had promised that all of the casegoods to complete the first two floors would be shipped from Vietnam, that Blue Leaf notified Owner that the shipment

would be incomplete. On January 5, 2017, Blue Leaf contacted Owner by email indicating that the first shipment would not arrive in Virginia until February 20, 2017 which was 19 days after the Contractual need-by date (not including any time for the necessary transport from Virginia to the Resort). Blue Leaf also indicated, contrary to Ms. Jimenez's December 5, 2016 email, that the "first two floors" would ship for arrival on February 20, 2017 but with only the "Hospitality unit , and headboard units."

56. In fact, Blue Leaf's first delivery of Casegoods included only the hospitality units for the 5th and 6th floors, and 60 headboards. There were no bed bases and none of the other casegoods needed to complete renovation of the 5th and 6th floors. There were no nightstands, no desk consoles, and no dressers until well into March 2017.

57. Blue Leaf did not complete delivery of the Casegoods for the Project until at least May 2017.

58. Further, Blue Leaf failed to deliver the Casegoods in the manner promised. As discussed above, Blue Leaf repeatedly acknowledged that shipments were to be made by floor and reiterated its commitment to abide by that method of delivery. As indicated above, Ms. Jimenez's December 5, 2016 email stated that "first two floors" would ship together for the first delivery of casegoods. Blue Leaf's Chief Executive Officer emailed Owner on January 5, 2016, stating that although only the hospitality units and headboards would be included in the first shipment, the "balance of items for 5 &6" floors would arrive complete in the second shipment. He also indicated that floors 3 & 4 would ship complete together and that floors 1 and 2 would ship complete together.

59. Owner consistently confirmed with Blue Leaf that Owner needed all of the furniture for floors 5 & 6 to be complete in that first shipment. In a January 6, 2017 email, Blue

13

Leaf was reminded of the Parties prior agreement regarding delivery: "That was what was agreed to before the holidays." Blue Leaf did not object to or otherwise challenge Owner's assertion. Yet none of the shipments included a full floor's worth of casegoods. Blue Leaf's shipments were piecemeal; products from multiple different floors arriving at the wrong time and in the wrong sequence.

60. In addition, Blue Leaf delivered the Casegoods with improper identifying information or, in some cases, no identifying information that would direct Owner's installation team to the proper room or floor for the items to be installed. These omissions and errors in Blue Leaf's delivery caused Owner to incur unnecessary and excessive delays and costs as numerous floors, rooms, and suites had to be revisited to move, adapt, and adjust to the haphazard way in which Blue Leaf provided the Casegoods to Owner.

61. As a result of Blue Leaf's delays, Owner suffered and now seeks significant damages. First, Owner incurred costs associated with warehousing and managing the Casegoods that are above and beyond what Owner would have paid had Blue Leaf delivered the Casegoods on time and in the promised manner. These costs include extended management fees, extended warehousing costs to cover the period of delay, and additional in-house labor costs associated with managing the piecemeal deliveries to mitigate impact to Resort operations.

62. Second, the delays forced Owner to direct its project contractor to perform additional out of scope work associated with relocating Casegoods from one floor or room to another and returning to rooms and floors that previously had been finished because Blue Leaf delivered items out of sequence.

63. Third, the delays disrupted Owner's business during peak travel season. Owner had requested delivery by floor to maximize the number of rooms that could be available for sale

during the renovation. Blue Leaf failed to deliver in the promised manner. Instead, Blue Leaf delivered partial shipments that were sent with no regard for the project schedule or floor-by-floor delivery plan. During peak travel season, when there was enough demand to sell every room at the resort, at least twenty percent (20%) of the rooms were incomplete and could not be sold.

64. In an extraordinary effort to mitigate the damages caused by Blue Leaf's delivery delays, Owner decided to put the Project on hold through the peak travel season so that as many rooms as possible would be available for guests. Accordingly, Owner incurred significant costs and expenses associated with remobilizing its contractors and design team in the fall when the peak season had slowed and the work could proceed.

### *BLUE LEAF'S PRODUCTS COULD NOT BE INSTALLED AS DESIGNED, CAUSING SIGNIFICANT INSTALLATION ISSUES AND EXCESSIVE COSTS*

65. The Casegoods that Blue Leaf delivered could not be installed as intended, causing Owner to incur additional unnecessary costs and further delaying the Project. For example, the hospitality units that Blue Leaf delivered could not be installed as designed or intended, forcing Owner to incur significant additional expenses associated with necessary modifications and rework. For example, the approved design of the hospitality unit included a glass front refrigerator with a sliding drawer above the appliance that would hold the coffee maker for the room. But the refrigerator could not fit in the unit that Blue Leaf manufactured and delivered. In order to install the refrigerator, Owner had to direct a costly revision to the unit that involved modifying the sliding drawer in a way that was not in conformance with the approved design. While Blue Leaf sent personnel to the Resort to modify the units at no charge

to Owner, Owner still incurred costs associated with the rework that would not have been necessary had Blue Leaf manufactured the units to the approved design.

66. In addition, the guest room headboards were designed with conduits so that cords for lights and other electronics could be safely and discretely tucked away. The delivered headboards had improperly-sized grommet holes that were drilled in the wrong places (thus frustrating the design intent). The installation team had to separately drill new grommet holes in the appropriate locations so that the cords could be properly routed. Installation of the headboards was therefore significantly slower and more expensive than anticipated.

67. Finally, Owner incurred additional installation expenses associated with the dressers that Blue Leaf delivered. Many of the dressers were not sized to specification so did not fit in the rooms, and the drawers on the dressers did include the approved hardware. Owner incurred costs associated with paying the project contractor to install the drawer pulls onsite.

## COUNT I - BREACH OF CONTRACT

68. Owner re-alleges paragraphs 1 through 67 as if fully set forth herein.

69. The Contract is a valid and enforceable agreement between the Parties.

70. Blue Leaf breached the Contract by, among other things, delivering defective Casegoods that were not fit for their intended purpose, failing to deliver the Casegoods on time and as agreed in the Contract, failing to deliver the Casegoods in the manner agreed between the parties, failing to produce and deliver Casegoods that could be installed as intended, and refusing to perform the warranty work, rework, remediation, or replacement of the Casegoods as required by the Contract.

71. Owner has performed all obligations under the Contract except for those obligations that it is excused from performing.

72. As a direct and proximate result of Blue Leaf's breaches of the Contract, Owner has suffered damages in an amount in excess of $1,000,000.

WHEREFORE, Owner seeks damages from Blue Leaf for an amount in excess of $1 million ($1,000,000.00) plus costs, interest and such other and further relief as the Court deems appropriate.

## COUNT II - BREACH OF EXPRESS WARRANTY UNDER UCC § 2-313

73. Owner re-alleges paragraphs 1 through 67 as if fully set forth herein.

74. Blue Leaf expressly warranted the Casegoods "from the time of owner acceptance from all manufacturing defects and guarantees to replace any or all parts should they prove deficient within 1 year from date of owner acceptance. All costs in this regard shall be borne by [Blue Leaf]. All items provided must be of contract quality and suitable for cont[r]act use."

75. Such warranties are express warranties within the meaning of the applicable Commercial Code and laws.

76. Blue Leaf breached its express warranties by presenting the Casegoods for use, and warranting that they conformed to the Contract requirements when many of the Casegoods were defective in that they were likely to cause Owner damage and/or injury.

77. As a direct and proximate result of Blue Leaf's breaches of express warranties, Owner has suffered actual damages.

78. Blue Leaf had knowledge or should reasonably have had knowledge of these defects at the time they warranted the Casegoods were fit for use in the Project.

79. Owner had no knowledge of these defects at the time they received the shipments of the Casegoods.

17

WHEREFORE, Owner seeks damages from Blue Leaf for an amount in excess of $1 million ($1,000,000.00) plus costs, interest and such other and further relief as the Court deems appropriate.

### COUNT III - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UCC § 2-314

80. Owner re-alleges paragraphs 1 through 67 as if fully set forth herein.

81. Blue Leaf impliedly warranted that Casegoods it suppled on the Project were acceptable in the hospitality industry, were fit and merchantable for their ordinary and anticipated use, and were not otherwise injurious or dangerous to resort guests.

82. Because of the defects identified herein, the Casegoods were not merchantable and were unfit for their ordinary use.

83. At the time of contracting, Blue Leaf held itself out as possessing superior knowledge and skill in the production, manufacture, and delivery of Casegoods for the hospitality industry.  Owner implicitly relied on that claimed knowledge and skill.

84. As a direct and proximate result of Blue Leaf's breaches of implied warranty, Owner has suffered actual damages.

85. Blue Leaf had knowledge or should reasonably have had knowledge of these defects at the time they warranted the Casegoods as fit for use at the Project.

86. Owner had no knowledge of these defects at the time the Casegoods were delivered to Owner.

WHEREFORE, Owner seeks damages from Blue Leaf for an amount in excess of $1 million ($1,000,000.00) plus costs, interest and such other and further relief as the Court deems appropriate.

## COUNT IV - BREACH OF WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE UNDER UCC § 2-315

87. Owner re-alleges paragraphs 1 through 67 as if fully set forth herein.

88. At the time that Blue Leaf sold or distributed the Casegoods which Owner purchased, Blue Leaf had reason to know of a particular purpose for which the products were required and that Owner and Owner's resort guests were relying on Blue Leaf's skill or judgment to select or furnish suitable products. The particular purpose varied by Casegood but all goods were to be used in a hospitality application. The hospitality unit, in particular, was supposed to be used to house a refrigerator and beverages. The quartz would be used in a typical hotel room.

89. Therefore, Blue Leaf made an implied warranty that the Casegoods which it sold or distributed were fit for the particular purpose.

90. Owner, in fact, relied upon Blue Leaf's representations of its skill and judgment to furnish goods that were appropriate for the Project and for use in the hospitality industry.

91. As described above, the Casegoods were not fit for the particular purpose for which they had been ordered. Therefore, Blue Leaf breached its implied warranty of fitness for a particular purpose.

92. The breach was a proximate cause of Owner's damages.

WHEREFORE, Owner seeks damages from Blue Leaf for an amount in excess of $1 million ($1,000,000.00) plus costs, interest and such other and further relief as the Court deems appropriate.

## CONCLUSION

WHEREFORE, Plaintiff, the Maryland Economic Development Corporation d/b/a Hyatt Regency Chesapeake Bay demands judgment in its favor and against Defendant Blue Leaf Hospitality, Inc. in an amount in excess of $1,000,000, plus the costs, expenses and attorneys'

fees associated with this action and authorized by the Contract, interest on the foregoing at the highest rate allowed by law, and such other and further relief as the Court deems just and equitable.

Dated: October 27, 2020.

**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard
Suite 4100
Miami, FL 33131
(305) 358-6300 Telephone
(305) 382-9910 Facsimile

By:_____
Dario A. Perez, Esq.
dperez@shutts.com
Florida Bar No. 58076

Jeffrey B. Charkow
(*Pro Hac Vice Pending*)
jcharkow@harriswinick.com
Harris Winick Harris LLP
333 West Wacker Drive, Suite 2060
Chicago, IL  60606
(312) 662-4600 Telephone

MIADOCS 21089623 2

20